DAYTON POWER & LIGHT COMPANY, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Dayton Power & Light Co. *v.* Pub. Util. Comm. (1983), 4 Ohio St. 3d 91.]

(No. 82-526—Decided April 13, 1983.)

*Mr. Stephen F. Koziar, Jr., Smith & Schnacke Co., L.P.A., Mr. Charles J. Faruki, Mr. Paul L. Horstman* and *Mr. D. Jeffrey Ireland,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Donn D. Rosenblum,* for appellee.

*Mr. William A. Spratley,* consumers' counsel, *Mr. Timothy C. Jochim* and *Ms. Janine L. Migden,* for intervening appellee.

SWEENEY, J. This appeal presents three issues for review. The first is whether the commission erred in disapproving appellant's proposed post-test-year wage adjustment. The second is whether the commission properly denied recovery of the increased excise tax levy imposed by Am. S.B. No. 448. The third is whether the exclusion of the Killen expenditures pursuant to R.C. 4909.15(A)(4) amounts to the confiscation of appellant's property in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States.

Before proceeding further, we note that "[t]he scope of this court's review of commission orders is set forth in R.C. 4903.13, which states in pertinent part:

" ' "A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

" ' "Under the 'unlawful or unreasonable' standard specified in R.C. 4903.13, this court will not reverse or modify an opinion and order of the Public Utilities Commission where the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty," *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 104 [12 O.O.3d 112]. See, also, *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 110 [12 O.O.3d 115]; *Ohio Utilities Co.* v. *Pub. Util Comm.* (1979), 58 Ohio St. 2d 153, 164 [12 O.O.3d 167]; *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 370 [10 O.O.3d 493]; *General Motors Corp.* v. *Pub. Util. Comm.* (1976), 47 Ohio St. 2d 58 [1 O.O.3d 35], paragraph two of the syllabus; *Cleveland Electric Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403 [71 O.O.2d 393], paragraph eight of the syllabus. We assess the appellant['s] objections with this standard of review in mind.' *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, 155-156 [21 O.O.3d 96]." *Armco, Inc.* v. *Pub. Util. Comm.* (1982), 69 Ohio St. 2d 401, 404-405 [21 O.O.3d 361].

## I

The issue of post-test-year wage adjustments has twice been before us recently. In *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 372 [21 O.O.3d 234] (hereinafter *"EOG"*) this court reversed an order of the commission granting the East Ohio Gas Company a 9.4 percent wage annualization to reflect an increase in wage rates, which increase went into effect after the designated test year had ended. After reprising the applicable statutes, R.C. 4909.15(A)(4), 4909.15(C), and 4909.15(D)(2)(b), we determined in *EOG* that the labor adjustment granted by the commission did not represent the type of anomalous condition for which inclusion of costs not incurred during the test period would be permissible.[3] As we noted in *EOG, supra,* at page 374, the General Assembly has expressly endorsed the test-year methodology:

"The language of R.C. 4909.15 is unequivocal. Rate increases are based on costs of rendering utility service *during the test period.* The dates of the test year follow directly from the date the utility chooses to file for its rate increase. Aware that its employee labor contract was about to be renegotiated, the utility company filed the application with the commission at a time which caused the test year to end prior to the beginning date of the new contract. The adjustment which EOG sought on rehearing to take into account its increased labor costs arising from that contract would violate the test-year concept embodied in R.C. 4909.15." (Emphasis *sic.*)

Appellant seeks to distinguish *EOG* on its facts and argues in its first

---

[3] Compare *EOG* with *Bd. of Commrs.* v. *Pub. Util. Comm.* (1982), 1 Ohio St. 3d 125 (post-test-year adjustment for line clearance allowed).

proposition of law that "[a] utility's labor expense, as determined under Rev. Code § 4909.15(A)(4), includes a known and measurable increase in wage rates pursuant to a contract negotiated and executed prior to the end of the test period." The significance that appellant attributes to the fact that it had already committed itself to the subject wage agreement while the new wage package in *EOG* had not been negotiated prior to the end of the test period is unwarranted. In the second case previously alluded to involving post-test-year wage adjustments, *Ohio Water Service Co.* v. *Pub. Util. Comm.* (1983), 3 Ohio St. 3d 1, we were presented with facts virtually identical to those presented herein. Ohio Water Service's wage agreement with its employees had been negotiated and the obligations had become fixed prior to the test year. The disputed wage increase in *Ohio Water Service* went into effect one day after the test period ended. Relying on our analysis in *EOG,* we held that the commission did not err in excluding the post-test-year wage adjustment. The same rationale applies to the case at bar. Thus, while we acknowledged in *EOG* and *Ohio Water Service* that the test-year data are not immutable and have upheld appropriate exceptions in previous cases,[4] exceptions must remain exceptions, and *ad hoc* tinkering with the statutory formula is not to become the rule. We recognized as much in *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153 [21 O.O.3d 96] (hereinafter *"CEI"*), in discussing the exceptions language contained in R.C. 4909.15(D)(2)(b), where we stated, at page 165, that "* * * the General Assembly undoubtably did not intend to build into its recently revised (1976) ratemaking formula a means by which the commission may effortlessly abrogate that very formula." Moreover, the commission itself came to a similar conclusion regarding test-period data under the revised ratemaking formula when it expressed doubt in a previous DP&L case, case No. 76-88-GA-AIR, as to whether it could continue its former practice of routinely permitting adjustments for known and measurable post-test-year cost changes. The commission stated, at page 6 of its opinion: "* * * Although the argument for post-test-year adjustments of this nature [l]oses force when dealing with much more current test years[5] and although the practice may be prohibited by Section 4909.15(C) Revised Code, the principle [annualization of certain costs at levels existing at the end of the test year] remains controlling with respect to cost changes which occur within the test period." *EOG, Ohio Water Service,* and now the case at bar simply confirm what the commission surmised in 1976 with respect to the General Assembly's intentional circumscription of the commission's authority to grant the type of post-test-year adjustment requested by appellant in its application. As one commentator has noted, "* * * adjusting only for selected changes is repugnant to the test year's theoretical roots — its usefulness in capturing for simultane-

---

[4] See, *e.g., Bd. of Commrs., supra,* fn. 3.

[5] The commission's recognition of "much more current test years" is borne out in the instant case as appellant filed a notice of intent to apply for a rate increase in October 1981 with another planned for mid-1982.

ous observation the dynamic interrelationship among revenue, expenses and investment."[6] Note, The Use of the Future Test Year in Utility Rate-making (1972), 52 Boston U.L. Rev. 791, 796. Accordingly, appellant's contention that R.C. 4909.15 mandates inclusion of the post-test-year wage adjustment is without merit.[7]

## II

Appellant asserts in its second proposition of law that "Revised Code § 4909.161 mandates that the public utilities commission approve rate schedules which will permit a public utility to fully recover in its rates the increased excise tax levy resulting from the 1% additional gross receipts tax imposed by Am. Senate Bill No. 448." As previously noted, the commission disallowed recovery of DP&L's tax payments made pursuant to Am. S.B. No. 448 that had not been recovered under the rates established in case No. 80-687-EL-AIR. Am. S.B. No. 448, which imposed an additional one percent tax on gross receipts, became effective on January 1, 1981 and expired June 30, 1981. Appellant paid the increased tax levy in four installments in January, March, June, and December 1981. The first three installment payments were made within the test year but prior to the November 15, 1981 effective date of R.C. 4909.161. The December payment was made outside the test period but after R.C. 4909.161 took effect. The commission acknowledged R.C. 4909.161 in denying rehearing but declined to make the adjustment sought by DP&L for the reason "that the legislation cannot logically be interpreted to permit recovery of a tax increase which had expired long before the rates set in this case became effective." While we find no fault with the commission's logic, we are compelled to disagree with its reading of R.C. 4909.161, at least insofar as the commission denied recovery of the December payment or any portion thereof not previously recovered.

R.C. 4909.161 states as follows:

"Notwithstanding the provisions of Chapters 4905. and 4909. of the Revised Code, the payment of any type of increased excise tax levy shall be considered to be a normal expense incurred by a public utility in the course of rendering service to the public, and may be recovered as such in accordance with an order of the public utilities commission. Any public utility required to

---

[6] OCC witness Miller expressed this view, stating that "* * * [selectivity] is the problem I have with the whole annualization procedure. It's not so much that I disagree with the fact that some figures may not be more properly adjusted, but all things should be looked at and adjusted has been my problem." See, generally, Catalant, Rate Making in an Inflationary Context: Theories and Applications, 110 Pub. Util. Fort., April 15, 1982, at page 53.

[7] Appellant also asserts that "* * * [t]he rates established * * * without recognition of the known and measurable wage increase are unreasonable and confiscatory," but offers little to support the contention. The record does contain exhibits comparing the actual payroll expenses for September 1981 ($7,255,717) and November 1981 ($7,183, 568), but appellant does not refer to these or any other calculations in making the argument that denial of the post-test-year wage adjustment is somehow confiscatory. Based on these figures, moreover, it would be difficult for appellant to argue unrepresentativeness, much less, confiscation.

pay any such increased excise tax levy may file with the public utilities commission revised rate schedules which will permit full recovery on an interim or permanent basis in its rates, of the amount of any resultant increased tax payments and the commission shall promptly act to approve such schedules.''

The statute sets forth the broad rule that "the payment of any type of increased excise tax levy shall be considered to be a normal expense. * * *'' This provision is keyed to "payment" of a tax irrespective of whether the tax upon which the payment has been made remains in effect or has expired. Ordinarily the commission would be empowered to deny recovery for an anomalous expense and, indeed, we do not disturb the commission's disallowance of the unrecovered portions attributable to the January, March and June 1981 installments paid on the temporary one percent gross receipts tax. The General Assembly's enactment of R.C. 4909.161 has, however, established as a matter of law that payment of any type of increased excise tax levy after November 15, 1981 shall be considered to be a normal expense incurred by a public utility in the course of rendering service to the public. Thus, the commission erred in disregarding the plain language and import of R.C. 4909.161 when it denied recovery of the December installment payment (or the unrecovered balance thereof) in the current case.

The record does not reflect the precise amounts of the installments paid pursuant to Am. S.B. No. 448 or the amount of the tax that has been recovered pursuant to the rates set in DP&L's previous rate case. We find it necessary, therefore, to reverse and remand the cause to the commission for further proceedings to determine (1) the amount of the installment paid in December, the full recovery of which is mandated by R.C. 4909.161, and (2) to prevent a possible over-recovery, the amount, if any, of monies previously recovered under the rates set in case No. 80-687-EL-AIR attributable to the December installment. Upon making these determinations, the commission shall modify its order so as to allow appellant to recover the difference between the December one percent excise tax payment and any monies already recovered thereon.

### III

### A

In its final proposition of law appellant challenges the constitutionality of the commission's disallowance of DP&L's request to treat its investment in the cancelled Killen facility as amortizable costs. Before proceeding to appellant's specific contentions regarding Killen, it is appropriate for us to review the historical development underlying current federal constitutional doctrine respecting utility ratemaking.

The leading federal constitutional cases involving claims of confiscatory utility rate orders establish two fundamental precepts. The first is that "* * * he who would upset the rate order * * * carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *FPC* v. *Hope Natural Gas Co.* (1944), 320 U.S. 591, 602.

See, also, *Permian Basin Area Rate Cases* (1968), 390 U.S 747, 767. The second precept is that a challenged rate order must be "viewed in its entirety," *FPC* v. *Natural Gas Pipeline Co.* (1942), 315 U.S. 575, 586; *Hope Natural Gas Co., supra,* at page 602, to determine whether the rates set pursuant to the order fall within "the broad zone of reasonableness." *Permian Basin Area Rate Cases, supra,* at page 770.[8]

The historical background from which these precepts developed was summarized by Justice Black in his dissenting opinion in *McCart* v. *Indianapolis Water Co.* (1938), 302 U.S. 419, 427-428:

"For the first hundred years of this Nation's history, federal courts did not interfere with state legislation fixing maximum rates for public services performed within the respective states. The state legislatures, according to a custom which this Court declared had existed 'from time immemorial' decided what those maximum rates should be. This Court also said that 'for protection against abuses by legislatures the people must resort to the polls, not to the courts.' It was not until 1890 that a divided court [in *Chicago, M & St. P. Ry. Co.* v. *Minnesota* (1890), 134 U.S. 418] finally repudiated its earlier constitutional interpretation and declared that due process of law requires judicial invalidation of legislative rates which the courts believe confiscatory. The dissenting Justices adhered to the long existing principle that regulation of public utilities was a 'legislative prerogative and not a judicial one.' " (Footnotes omitted.)

In *Natural Gas Pipeline Co., supra,* Justice Black expanded upon his *McCart* history lesson in a concurring opinion joined by Justices Douglas and Murphy where he once again expressed his deep disagreement with the notion that " 'due process' means no less than 'reasonableness judicially determined' * * * which, in the words of Justice Holmes, makes the sky the limit of judicial power to declare legislative acts unconstitutional, the conclusions of judges, substituted for those of legislatures, become a broad and varying standard of constitutionality." 315 U.S., at page 600. Justice Frankfurter, concurring separately, took issue with Justice Black's historical exegesis, stating, at page 609, that "[w]hile the doctrine of 'confiscation,' as a limitation to be enforced by the judiciary upon the legislative power to fix utility

---

[8] A third important precept to be drawn from the federal cases, that "[t]he Constitution does not bind rate-making bodies to the service of any single formula or a combination of formulas," *Natural Gas Pipeline Co., supra,* at page 586; *Hope Natural Gas Co., supra,* at page 600; *Permian Basin Area Rate Cases, supra,* at page 800, need not concern us because the General Assembly has prescribed a statutory ratemaking formula for the commission to follow in contradistinction to the broad grant of authority delegated by Congress to the Federal Power Commission (and now FERC) to establish rates under the Natural Gas Act as amended, Sections 717 *et seq.,* Title 15, U.S. Code.

Accordingly, it is unnecessary to reprise the constitutional formula based on the rule of *Smyth* v. *Ames* (1898), 169 U.S. 466, 547 ("fair return upon * * * value"), the controversy engendered by *Smyth* during the years of its ascendancy, see, *e.g., Missouri, ex rel. Southwestern Bell Tel. Co.,* v. *Pub. Serv. Comm.* (1923), 262 U.S. 276, 289 (Brandeis, J., concurring), or the prudent investment theory proposed by Justice Brandeis in *Southwestern Bell* to supplant *Smyth* and provide a more workable mode of constitutional analysis.

rates, was first applied in *Chicago, M & St. P. Ry. Co.* v. *Minnesota,* 134 U.S. 418, that decision followed principles, expounded in *Stone* v. *Farmers' Loan & Trust Co.,* 116 U.S. 307, especially at 331. * * * Mr. Chief Justice Waite, who delivered the opinion in the *Stone* case as well as in the earlier decision in *Munn* v. *Illinois,* 94 U.S. 113, was therefore the author of the doctrine of 'confiscation' and its corollary, 'judicial review.' His view was shared by such stout respecters of legislative power over utilities as Mr. Justice Miller * * * Mr. Justice Bradley * * * and Mr. Justice Harlan. The latter, indeed, agreed with Mr. Justice Field that the regulatory power exercised in the *Railroad Commission Cases,* 116 U.S. 307, constituted an impairment of the obligation of contract. By no one was the doctrine of judicial review more emphatically accepted, and applied in favor of a public utility, than by Mr. Justice Harlan in the decision and opinion in *Covington & Lexington Turnpike Co.* v. *Sandford,* 164 U.S. 578, especially at 591-95."

While we are not here concerned with whether Justice Black or Justice Frankfurter was more faithful to the muse of history, we do find it significant that Justice Frankfurter did not take exception to Justice Black's characterization of *Natural Gas Pipeline Co.* as "* * * a new chapter in the regulation of utility rates * * * [which] erases much which has been written in rate cases during the last half century * * *." *Id.,* at page 602. The majority opinion in the 1944 *Hope Natural Gas Co.* case essentially adopted the theory of legislative hegemony in the sphere of economic regulation expressed in the *Natural Gas Pipeline Co.* concurrence. The court stated, at page 601, "that the 'authority of Congress to regulate the prices of commodities in interstate commerce is at least as great under the Fifth Amendment as is that of the States under the Fourteenth to regulate the prices of commodities in intrastate commerce.' 315 U.S. p. 582. Ratemaking is indeed but one species of price-fixing. *Munn* v. *Illinois,* 94 U.S. 113, 134. The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid."

In *Permian Basin Area Rate Cases, supra,* the court deferred to the legislative will as expressed by Congress' administrative surrogate, the Federal Power Commission, so completely that Justice Douglas, the author of the *Hope Natural Gas Co.* opinion, was compelled to dissent in an ironic turnabout. 390 U.S., at pages 829-845. In the words of one commentator, "with the *Permian* decision the Court has completed a long circle back to almost where it started in *Munn* [v. *Illinois* (1876), 94 U.S. 113] 92 years previous. The Constitution no longer provides any special protection for the utility investor. Regulation is deemed no different from any other governmental action; it can 'limit stringently' the profitability of his investment in endeavoring to balance the 'broad public interest entrusted to its protection.' " Bernstein, Utility Rate Regulation: The Little Locomotive That Couldn't (1970), Wash. U.L.Q. 223, 259-260. Although utility companies continue to appeal allegedly confiscatory rate orders that state courts have

upheld as constitutional, the United States Supreme Court in recent years has been disinclined to hear these appeals and has dismissed them summarily either for want of a substantial federal question, see, *e.g., Appalachian Power Co.* v. *West Virginia Pub. Service Comm.* (W.Va. Oct. 10, 1977), unreported, appeal dismissed (1978), 435 U.S. 901; *South Central Bell Tel. Co.* v. *Louisiana Pub. Serv. Comm.* (La. 1977), 352 So. 2d 964, appeal dismissed (1978), 437 U.S. 911; *California Assn. of Utility Shareholders* v. *California Pub. Util. Comm.* (Cal. July 19, 1979), unreported, appeal dismissed (1979), 444 U.S. 986; *C & SOE* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 175 [18 O.O.3d 389], appeal dismissed (1981), 452 U.S. 933; or for want of a properly presented federal question, see *CEI, supra* (67 Ohio St. 2d 153 [21 O.O.3d 96]), appeal dismissed (1982), 455 U.S. 914, 71 L. Ed. 2d 455, appeal dismissed (1983), 74 L. Ed. 2d 943. The high court's summary dispositions of the aforementioned appeals at the least suggest that the court has implicitly recognized the commentator's conclusion that "the Constitution no longer provides any special protection for the utility investor." It is against this federal constitutional backdrop that we now view appellant's specific contentions regarding the disallowed Killen expenditures.

### III

### B

Appellant contends that "[a]n interpretation of Rev. Code § 4909.15(A)(4) which excludes from a utility's cost of service the accumulated costs associated with the cancellation of a planned generating facility is unconstitutional as applied to that utility, and violates the Fifth Amendment applied to the Federal Constitution."[9] Specifically, DP&L argues that denying recovery of the Killen expenditures amounts to the confiscation of its property and urges us to overturn our decision in *CEI*.

In *CEI, supra,* we held in the syllabus that "[t]he Public Utilities Commission's treatment of a utility's investment in terminated nuclear generation stations as amortizable costs to be recovered from the utility's ratepayers is inconsistent with the ratemaking formula contained in R.C. 4909.15 and is unreasonable and unlawful." Several of the constitutional arguments advanced by appellant are similar to the statutory arguments that we considered and rejected in *CEI*. For example, appellant would rely on R.C. 4905.22 to support its contention that Killen expenditures "were incurred in order to provide necessary and adequate service."[10] The commis-

---

[9] The confiscation clause of the Fifth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. See *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith* (1980), 449 U.S. 155.

[10] R.C. 4905.22 provides in pertinent part:

"Every public utility shall furnish necessary and adequate service and facilities, and every public utility shall furnish and provide with respect to its business such instrumentalities and facilities, as are adequate and in all respects just and reasonable. * * *"

sion in *CEI* phrased its argument in virtually identical terms. We addressed this argument, at pages 163-164, stating as follows:

"The commission urges that 'an expenditure by a utility can be considered a cost of rendering the public utility service if it fails in fact to achieve its intended purpose * * * [if] the expense was reasonably calculated to provide [future] utility service at a reasonable cost.' The underpinnings for the commission rationale may be found in those statutory provisions that require utilities to maintain adequate service presently and for the foreseeable future. See, *e.g.,* R.C. 4905.22 (adequate service and facilities).

"Notwithstanding the provisions that impose a duty on utility companies to plan for the future, the question under R.C. 4909.15(A)(4) remains whether the cancelled plant expenditures represent '[t]he cost to the utility of rendering the public utility service for the test period.' Test period considerations aside, what the company sought and what the commission granted was the amortization as service-related costs of an investment that never provided any service whatsoever to the utility's customers.[11]

"* * * The now terminated nuclear plants represented a major capital investment that ultimately would have been included in the rate base under R.C. 4909.15(A)(1), had the projects not been cancelled. It is our opinion that R.C. 4909.15(A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period. * * *

"The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed into an ordinary operating expense pursuant to R.C. 4909.15(A)(4) by commission fiat. The commission's statement that '[c]ancellation does not create a past loss, but gives rise to a current cost' is unpersuasive. Under this rationale we question whether there could ever be a 'past loss' the return of which would not be recoverable in future ratemaking proceedings notwithstanding the commission's assertion to the contrary. * * *'"

Appellant further contends that the commission, in denying the Killen amortization on the strength of this court's decision in *CEI,* disregarded the constitutional requirement announced in *FPC* v. *Hope Natural Gas Co.,*

---

[11] Cf. *West Ohio Gas Co.* v. *Pub. Util. Comm.* (1935), 294 U.S. 63, 78 (Stone, J., concurring): "* * * The property for which constitutional protection is invoked is that 'used and useful in the public service,' not the enlarged business of the future which petitioner hopes to obtain through the present expenditure of money. I know of no constitutional principle upon which this expenditure must be taken from the pockets of the patrons of the present business, any more than the cost of future service lines required to carry on the new business. * * *'"

Although Justice Stone made the above-quoted statement to express his disagreement with the expansive constitutional protection afforded "prudent outlay" by his brethren, his narrower conception of that which the Constitution protects became the majority position in *Natural Gas Pipeline Co.,* an opinion delivered by Chief Justice Stone. Moreover, Justice Stone joined the *Hope Natural Gas Co.* majority, which delimited the constitutional inquiry even further by deleting the references to "constitutional requirements" and "the limits of due process" that the concurring justices in *Natural Gas Pipeline Co.* found objectionable.

*supra* (320 U.S. 591), at page 603, that "[t]he ratemaking process * * * involves a balancing of the investor and the consumer interest." Appellant asserts that it "and all Ohio utilities are disadvantaged in the capital markets where they must attract capital in order to plan for the future and to provide adequate facilities under Rev. Code §4905.22 because the utilities must inform their investors that they may not be permitted to earn a rate of return on this investment if the facilities which are prudently planned and necessary today are cancelled in the future."

This same argument was presented under the rubric of "policy" in *CEI* where we stated, at pages 167-168:

"We are mindful of the policy considerations that prompted the commission's decision. The commission, CEI, and the *amici* argue strenuously that to rule as we have today will seriously disadvantage Ohio utilities in capital markets thereby 'driv[ing] up the return on investment required by investors in Ohio utilities.' This gloomy scenario, however, does not imbue the commission with the authority to rewrite the statutes. The statutes in question contain no provisions insulating investors from the type of losses sustained in the cancelled-plants venture.

"If, as has been argued, these are parlous times for the utilities industry, and if, therefore, in order to attract and retain investment capital, utility companies must not only be granted a fair and reasonable rate of return pursuant to statute but must also be assured the return of capital invested in failed projects that would otherwise not be recoverable under the ratemaking formula, then the commission and the utilities should petition the General Assembly to enact changes in the ratemaking structure so as to provide this extra modicum of protection for the investors. Absent such explicit statutory authorization, however, the commission may not benefit the investors by guaranteeing the full return of their capital at the expense of the ratepayers. Under the ratemaking formula now in effect consumers are not chargeable for utility investments and expenditures that are neither included in the rate base nor properly categorized as costs. What we previously stated in a rate base case is applicable to the case at bar: '* * * It is only proper that their [the investors'] venture be found operational before they commence to recoup their capital outlays from the consumers.' *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449, 456-457 [12 O.O.3d 378]."

In *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449 [12 O.O.3d 378] (hereinafter *"Toledo Edison"*), this court held that the Davis-Besse Unit 1 generating station, which was not "used and useful in rendering the public utility service" pursuant to R.C. 4909.15(A)(1), could not be included in the utility's rate base. Toledo Edison made a constitutional argument similar to that presented herein to which we responded, at page 456:

"Toledo Edison argues that to deny inclusion of the unit in its rate base would be tantamount to the confiscation of its property in violation of its constitutional right to due process of law. In *Columbus Gas & Fuel Co.* v. *Pub. Util. Comm., supra* (292 U.S. 398), the Supreme Court addressed the issue of

whether gas fields not yet in service should be included in the rate base. Justice Cardozo, speaking for the court, stated, at page 406:

" 'There will be no need in the computation of the rate base to include the * * * value of fields not presently in use, unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital. * * * Postponement of * * * profit until the state of imminent or present use is not an act of confiscation, but a legitimate exercise of legislative judgment.'

"'* * *

"It would be inequitable to prematurely shift the risk of plant failure from the utility's investors to the ratepayers by the inclusion in the rate base of highly complex and innovative technology which has not been proven to be reasonably free from significant design or construction defects. The initial risk of failure is appropriately borne by the investors, who have undertaken the project and who will ultimately profit from its success."

While we again note that *Toledo Edison* involved rate base consideration under 4909.15(A)(1), as opposed to matters relating to cost of service under R.C. 4909.15(A)(4), the analogy is a fair one insofar as it indicates that the General Assembly has adopted a consistent position in balancing investor and consumer interests in utility ratemaking. Pursuant to the statutory ratemaking formula investors are assured a fair and reasonable return on property that is determined to be used and useful, R.C. 4909.15(A)(2), plus the return of costs incurred in rendering the public service, R.C. 4909.15(A)(4), while consumers may not be charged "for utility investments and expenditures that are neither included in the rate base nor properly categorized as costs."[12] We see no constitutional infirmity in the balance thus struck by the General Assembly.

Appellant also presents an elaborate argument premised on the Federal Energy Regulatory Commission (FERC) Uniform System of Accounts, 18 C.F.R., Part 101, which Ohio utilities are required to follow pursuant to Ohio

---

[12] Am. Sub. S.B. No. 378 as passed by the Senate included the following language, offered to amend R.C. 4909.154:

"In its establishment of just and reasonable rates for public utilities under section 4909.15 of the Revised Code, the public utilities commission *shall allow any expenditures* incurred in the provision of public utility services unless such expenditures are found by the commission to have resulted from imprudent management."

This proposed amendatory language was deleted by the House of Representatives and did not reappear in the final version of the bill. See Am. Sub. S.B. No. 378.

Although Section 7 of Am. Sub. S.B. No. 378 as passed by the Senate, stated that, "Section 4909.154 of the Revised Code, as amended in Section 1 of this act, is not intended to reverse *Consumers' Counsel* v. *Public Utilities Commission* (1981), 67 Ohio St. 2d 153 [21 O.O.3d 96], with respect to those specific capital costs that were disallowed in that case," the "any expenditures" language of the amendment would have broadened the range of allowable expenses considerably. That the General Assembly chose not to enact this proposed provision is further evidence that our decision in *CEI* comports with the legislative intention underlying the ratemaking statutes.

Adm. Code 4901:1-9-05,[13] to support inclusion of its Killen expenditures. We were treated to similar accounting-based contentions in *CEI* but found it unnecessary to discuss them in our opinion because as OCC notes, "it is *not* the Uniform System of Accounts which governs public utility ratemaking, but rather the Ohio Revised Code." (Emphasis *sic*.) Thus, the controlling factor for ratemaking purposes is not whether the Killen expenditures must be accounted for under Account 182, "extraordinary property losses," as appellant claims, or whether these expenditures should be assigned to Account No. 121, "nonutility property" or Account No. 426.5, "other deductions," as OCC suggests. While we have acknowledged the Uniform System of Accounts in previous opinions, see, *e.g., Consumers' Counsel* v. *Pub. Util. Comm., supra* (58 Ohio St. 2d 108 [12 O.O.3d 115]), at page 112; *Toledo Edison, supra, fn.,* at pages 455-456, we have never held and do not hold today that accounting practice and the ratemaking provisions of the Revised Code are functionally equivalent.[14] We rejected *sub silentio* this line of argument based on the Uniform System of Accounts in *CEI* and expressly reject it in the case at bar.[15]

In its final argument appellant asserts that "[e]xclusion of the costs associated with the cancellation of Killen Unit No. 1 guarantees that DP&L will be unable to earn a fair and reasonable rate of return." There is little evidentiary support for this contention. As the commission stated in its order, DP&L "objected to the staff's reversal of the company's [proposed Killen] adjustment, but presented no witnesses relative to the subject and did

---

[13] Ohio Adm. Code 4901:1-9-05 provides in pertinent part:

"The system of accounts and records, identified and designated as 'Uniform System of Accounts Prescribed for Public Utilities and Licensees, effective January 1, 1961,' as adopted by the Federal Power Commission, is adopted by this Commission effective as of January 1, 1961, for electric light companies operating within the State of Ohio which are subject to the jurisdiction of the Federal Power Commission except to the extent that the provisions of said Uniform System of Accounts are inconsistent in any way with the outstanding orders of this Commission pertaining to the accounting treatment to be followed with respect to emergency facilities and the Federal income tax results thereof and with respect to accelerated depreciation and the Federal income tax results thereof. This Commission reserves to itself the right to require the creation and maintenance of such additional accounts as may hereafter be prescribed, to cover the accounting procedure of such electric light companies operating in the State of Ohio. * * *"

[14] The commission acknowledged the distinction between accounting and ratemaking in its opinion dated March 17, 1982, in case Nos. 81-146-EL-AIR and 81-1565-EL-UNC, stating, at page 28, that "although we cannot allow an amortization allowance for ratemaking purposes, for book purposes the applicant is authorized to amortize the balances assignable to the terminated nuclear units over an appropriate period of time, not to exceed 15 years." See *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 111.

[15] Appellant's argument based on the Uniform System of Accounts is further flawed by its internal inconsistency. As OCC recognized, "[a]ppellant did not and cannot explain the contradiction between its apparent recognition that Account 182 covers 'extraordinary property losses' and its simultaneous claim that Account 182 relates to 'normal expenses.'"

not address the matter on brief.''[16] This failure to present evidence relating to Killen and the effect thereof on the rates set by the commission may perhaps be explained if, as it appears, appellant's position is that excluding the Killen expenditures is confiscatory as a matter of law. *Per se* confiscation in a utility rate case may exist as an abstract premise, but the constitutional cases make it clear that a successful challenge must demonstrate that the rate order when reviewed in its entirety falls outside the "broad zone of reasonableness," *Permian Basin Area Rate Cases, supra,* at page 770, and the "heavy burden" of establishing unreasonableness must be borne by the challenger. *Hope Natural Gas Co., supra,* at page 602.

Appellant's expert testified that "the * * * [*CEI*] ruling serves to increase the risk associated with common stock ownership of electric utilities in this state," but did not attempt to quantify this perceived additional risk. Moreover, there is nothing to suggest that the commission did not take this purportedly greater risk into account in its order.[17] In determining the cost of equity capital the commission concluded that 16.44 percent was a "reasonable estimate," even though 16.44 percent was in "the upper half of the * * * [cost of capital] range * * *." The commission selected this figure after finding "* * * it imprudent to dampen any optimism that may exist in the investment community with respect to the possibility that this company may be emerging from its extended financial crisis by authorizing an unduly conservative equity earnings opportunity in this proceeding." The commission's rate of return summary stated that "[a]pplying a cost of equity of 16.44 percent to the equity component of the capital structure approved herein produces, when combined with the findings relative to long-term debt and preferred stock, a weighted cost of capital of 12.11 percent. The Commission is of the opinion that a rate of return of 12.11 percent is sufficient to provide applicant reasonable compensation for the electric service it renders customers affected by this application." It follows that if the 16.44 percent cost of equity component is within the upper half of the range, then the 12.11 percent rate of return is also within the upper range. Thus, even if appellant were correct in its assertion that the Killen exclusion precludes it from earning its authorized rate of return, there is nothing in the record to suggest that any reduced rate of return attributable to the Killen exclusion would not still be constitutional because "* * * any rate selected * * * from the broad

---

[16] At oral argument appellant briefly mentioned Killen but presented no argument relating thereto, relying instead on its briefs.

[17] The commission order did not specifically refer to "the increase in investment risk resulting from the [*CEI*] decision," as did the order in case Nos. 81-146-EL-AIR and 81-1565-EL-UNC (at page 40), but it is quite clear that the commission is fully cognizant of *CEI.* Indeed, it is the commission's position that the instant appeal "concerns the definition of risks * * * [and *CEI*] merely defined the economic risks and benefits under Ohio law. One of the risks is that investors, not consumers, will be required to pay for plants which will never provide service to ratepayers. This, of course, may make Ohio utilities' capital and debt less attractive to investors, but it does not make rates confiscatory."

zone of reasonableness * * * cannot properly be attacked as confiscatory." *Permian Basin Area Rate Cases, supra,* at page 770.

To prevail, appellant must prove not only the unreasonableness of the Killen exclusion but also the confiscatory effect this exclusion had on the rates established by the commission, viewing the rate order "in its entirety." *Hope Natural Gas Co., supra,* at page 602. We are unprepared to say that appellant has carried this "heavy burden" in either respect. In *CEI* we held that a utility's investment in cancelled generating facilities could not be treated as amortizable costs to be recovered from the utility's ratepayers under the statutory ratemaking formula. Appellant's arguments in the instant case are but variations on the statutory and policy arguments we found wanting in *CEI,* and we find them no more appealing when attired in constitutional raiment. Moreover, even these unpersuasive constitutional contentions lose whatever force they might have had in the absence of any showing that the commission's order "viewed in its entirety" is confiscatory. The rule is clear: "* * * If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry * * * is at an end." *Hope Natural Gas Co., supra,* at page 602. The total effect of the commission's rate order cannot be said to be unjust and unreasonable and therefore our judicial inquiry is at an end. Accordingly, we hold that the commission's disallowance of DP&L's request to treat its Killen expenditures as amortizable costs pursuant to R.C. 4909.15(A)(4) does not violate the Fifth and Fourteenth Amendments to the Constitution of the United States.

For the reasons hereinbefore stated the decision of the commission is affirmed in part and reversed in part and the cause is remanded to the commission for further proceedings consistent with this opinion.

*Judgment accordingly.*

CELEBREZZE, C.J., W. BROWN, C. BROWN and WILSON, JJ., concur.

LOCHER and HOLMES, JJ., concur in part and dissent in part.

WILSON, J., of the Second Appellate District, sitting by assignment.

LOCHER, J., concurring in part and dissenting in part. I concur in Parts I and III of the majority opinion. As to Part II, however, I dissent.

This court has traditionally upheld the test-year concept. Part I of the majority opinion, *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 372 [21 O.O.3d 234], and *Ohio Water Service Co.* v. *Pub. Util. Comm.* (1983), 3 Ohio St. 3d 1, enhance that tradition. Nevertheless, the majority fails to recognize that the issue in Part II is essentially the same as that in Part I: whether this court will reverse the decision of the Public Utilities Commission to exclude a post-test-year expense from consideration. Both *Consumers' Counsel, supra,* and *Ohio Water Service, supra,* lead to the same conclusion. We should affirm the decision of the Public Utilities Commission

because: (1) the requested expense was incurred after the test year, and (2) the utility decided when to file its rate case. See *Consumers' Counsel, supra,* at pages 374-376.

We should not apply or construe R.C. 4909.161. Nothing in that provision suggests that it was intended to supersede the test-year concept. Furthermore, its application may violate the constitutional prohibition against the retroactive application of statutes, see Section 28, Article II of the Ohio Constitution, and the statutory presumption in favor of prospective laws, see R.C. 1.48, because R.C. 4909.161 became effective *after* the original tax liability accrued and *after* the test year.

Accordingly, I would affirm the decision of the Public Utilities Commission as to all three issues before this court.

HOLMES, J., concurring in part and dissenting in part. I agree with the majority's resolution of the second and third issues. However, with respect to the first issue, the denial of appellant's post-test-year wage adjustment, I dissent on the basis of my dissenting opinions in *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 372, 376 [21 O.O.3d 234], and *Ohio Water Service Co.* v. *Pub. Util. Comm.* (1983), 3 Ohio St. 3d 1, 4.