GREEN COVE RESORT I OWNERS' ASSOCIATION, APPELLANT,
v. PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *Green Cove Resort I Owners' Assn. v. Pub. Util. Comm.*, 103 Ohio St.3d 125, 2004-Ohio-4774.]

(No. 2003–0613—Submitted June 9, 2004—Decided September 22, 2004.)

O'DONNELL, J.

## Background

{¶ 1} This is an appeal as of right that involves a real estate development project that began in the mid–1980s, located just west of the Davis Besse nuclear plant on the Lake Erie shore in Oak Harbor, known as the Green Cove development. The development comprises four condominium resorts known as Green Cove Resorts I, III, IV, and V[1] and the "Wild Wings" properties, which include a marina and campground; a convenience store, gas station, and bar and grill; boat-slip condominiums; and a recreational-vehicle campsite.

{¶ 2} This appeal tests the reasonableness of the rates charged by a small public utility, Carroll Township Treatment Services, L.L.C. ("CTTS"), for waste-water-treatment services provided to the owners and occupants of properties in the Green Cove development. The facilities that CTTS uses to provide utility service consist of an automated package treatment plant and related collection piping and pumping system formerly owned by the corporate developers of the Green Cove development and transferred by them to CTTS, effective May 31, 1999.

{¶ 3} In 1999, CTTS filed an application with the commission for a certificate of public convenience and necessity in PUCO case No. 99–78–ST–ACE, entitled *In re Carroll Twp. Treatment Services, L.L.C., for a Certificate of Public Conven-*

---

1. There is no Green Cove Resort II.

*ience and Necessity to Provide Sewer Service in Portions of Carroll Twp., Ottawa Cty., Ohio* ("certificate proceedings"). The owners' associations of all four Green Cove resort condominiums initially participated in the certification proceedings, arguing that the rates proposed by CTTS were excessive and that the rate base proposed by CTTS was improperly calculated. As set forth in the commission's summary of the certification proceedings, after an unsuccessful settlement conference and two continuances of scheduled hearings, the associations withdrew from the certification proceedings and requested that the commission proceed to establish wastewater rates for CTTS. In early January 2000, the commission's staff and CTTS entered into a joint stipulation and recommendation resolving all outstanding issues in the certification proceedings and establishing a wastewater rate for CTTS. By a finding and order dated January 20, 2000, the commission approved CTTS's application for certification and its stipulated wastewater rate.

{¶ 4} About eight months later, the owners' association [2] for Green Cove Resort I filed a complaint against CTTS under R.C. 4905.26, alleging that CTTS's wastewater rate was excessive.

{¶ 5} In the complaint case, the commission ordered a rate reduction based on the commission's finding that its rate-base determination in the certification proceedings was overstated, causing the return-on-capital component of the revenue requirement to be likewise overstated. The commission found that (1) the staff-determined rate base adopted in the certification proceedings was based on then available information that there had been no capital contributed by utility customers to the wastewater facility, (2) under R.C. 4909.05(J), contributions to defray costs of construction (or contributions in aid of construction) should be deducted from the utility's rate base so that the utility does not recover and earn a return on customer-supplied capital, and (3) there was evidence adduced in the complaint case that there were contributions in aid of construction made by purchasers of Green Cove condominiums. Based on the foregoing and the consequential adjustments called for by the commission, it stated in the order, "Accordingly, CTTS should recalculate its rates for sewerage service based on only the newly calculated rate base, making no other changes to rate base, rate of return, or operating expenses."

{¶ 6} Not satisfied with the commission's order in the complaint case, the owners' association and CTTS both timely filed applications for rehearing, which

---

2. The term "owners' association" in this opinion refers to the Green Cove Resort I Owners' Association. Although the other three owners' associations did not join the Green Cove Resort I Owners' Association in its complaint case because of cost considerations, they made the commission aware of their support of the complaint.

the commission denied. The owners' association then perfected this appeal, claiming that the commission had committed reversible error in four respects.

## Discussion

{¶ 7} All of the errors asserted by the owners' association deal with the commission's determination of the amount of the contributions in aid of construction ("CIAC") that should be deducted from CTTS's rate base or the effects of that deduction on CTTS's rates charged for sewer service.

## Determination of the CIAC Deduction

{¶ 8} As previously noted, the commission specifically found that CIAC should be deducted from the rate base and that there was evidence in the complaint case that purchasers of the condominiums had in fact made contributions in aid of construction.

{¶ 9} The owners' association at various stages of the complaint proceedings and this appeal has taken differing positions as to CTTS's rate base and the determination of the CIAC deduction. For instance, the owners' association has asserted that the CTTS rate base for the owners' association should be separated from the rate bases of the other three condominiums and should be determined to be zero, or, alternatively, that the exact dollar amount of CIAC for the sewerage treatment facilities can be directly determined from the testimony and evidence in the complaint case without resort to a cost-recovery ratio like the one employed by the commission. The commission rejected these arguments. Though the commission found that the owners' association had failed to directly prove the amount of the CIAC, the commission did conclude that the owners' association had met its burden of proof on determining the CIAC by using a cost-recovery ratio. We now examine that latter determination.

{¶ 10} The commission's determination is based on its specific finding of fact that "[a]s originally conceived, the Green Cove resort would have a total of 249 buildings with approximately three units per building, or a total of 747 units." The significance of that finding of fact appears in the commission's description of the method used to calculate the appropriate CIAC deduction:

{¶ 11} "While the projected number of units to be sold was decreased, due to declining condominium sales, for purposes of this proceeding, the Commission will assume that the wastewater system rate base of $570,738 was to be fully accounted for upon completion of the sale of 747 units. The evidence shows that a total of approximately 322 units have been sold (Tr. II, 89). This leaves a balance of 425 unsold units. Therefore, we calculate that the total contributed capital toward the wastewater facility was 43.1 percent, leaving 56.9 percent of the wastewater plant unrecovered. Accordingly, CTTS should recalculate its

rates for sewerage service based on only the newly calculated rate base, making no other changes to rate base, rate of return, or operating expenses."

{¶ 12} Thus, the commission's determination of the CIAC deduction is grounded in an assumption that completion and sale of 747 condominium units would result in the developer's full recovery of its rate-base investment. The owners' association contends that that assumption is false and that the commission's reliance on it constitutes reversible error.

{¶ 13} The owners' association readily concedes that the number of 747 condominium units was employed at the planning stage of the Green Cove development but cautions that the story of the actual development goes well beyond the planning stage and argues that the commission's assumption that 747 units should be employed in the calculation of a contributed capital percentage is contradicted by the evidence.

{¶ 14} The initial land clearing and infrastructure construction for the Green Cove Resort, as well as some condominium construction, were begun in 1986. In 1987, the first full year of construction, the planning number of 747 condominium units was reduced to 570 units. From 1987 onward, it was the figure of 570 units that (1) was used in the developer's cost-recovery accounting, (2) was used in preparing income and balance sheets, and (3) was reflected in the income tax returns of the corporate developers.

{¶ 15} As the owners' association argued: "First, the use of the 747 figure as the denominator is not supported by the testimony of *any* witness as being the correct number to utilize. Second, it was a planning number which was replaced by the 570 figure in 1987 pursuant to the approval of the developer and his outside accountants. And, it was the 570 unit figure that was utilized in the developer's books of account and his tax returns." (Emphasis sic.)

{¶ 16} Despite this, the commission argues that its findings and conclusions were amply supported by the record and urges this court to accept the 747 figure that the commission used in its order.

{¶ 17} As the commission correctly observes, (1) this court will not reverse the commission as to questions of fact where the record contains sufficient probative evidence to show that the commission's determination was not against the manifest weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty[3] and (2) the commission's decision will not be disturbed where there is sufficient probative evidence in the record to support it.[4]

---

3. E.g., *Dayton Power & Light Co. v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 91, 94, 4 OBR 341, 447 N.E.2d 733.

4. E.g., *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 163, 666 N.E.2d 1372.

{¶ 18} We conclude, however, that the owners' association is correct. The commission's order is not supported by the record. The fact that 747 units were planned when the development was conceived is irrelevant, because the plan changed and the developer actually used 570 units in its cost-recovery accounting. None of the units were sold before 1987, when the developer reduced the number of units in the plan, and once that change was made, appropriate bookkeeping adjustments were likewise made so that the 570 figure was used in the developer's cost-recovery accounting for every unit that was sold. The commission's view that the 747 figure should be used is not realistic. The number 570 is the proper denominator in the commission's ratio for determining the CIAC.

## Additional CIAC Deduction/Wild Wings Properties

{¶ 19} The owners' association argues that CTTS's rate base should be further reduced by the amount of the CIAC provided by the Wild Wings properties. Indeed, consistency would seem to dictate that treatment. While the argument of the owners' association is valid in theory, it depends upon proof of CIAC from the Wild Wings properties. Simply put, that proof is lacking. The owners' association has failed to provide credible evidence of any quantifiable contributions of capital to CTTS on the part of the Wild Wings properties.

## Separate Rates for the Condominium and the Wild Wings Properties

{¶ 20} The owners' association also complains about the commission's approval in the complaint case of a uniform rate for sewerage service throughout the Green Cove development. Rather, argues the owners' association, the commission should have established two separate rates, one for the four condominium resort properties and one for the Wild Wings properties. The argument for two separate rates is grounded in the assertion by the owners' association that the two groups of sewerage service customers "had substantially disparate amounts of contributed capital."

{¶ 21} The commission acknowledges that it is not unusual, in the exercise of its unique rate-design expertise, for it to establish multiple rates for a particular class of customers. As the owners' association notes, "In most cases, these distinct rate categories are justified based on cost-of-service considerations." Multiple rates are typically established with the aid of formal cost-of-service studies, which determine costs to serve different customer groups. In this case, however, the owners' association submitted no formal cost-of-service studies.

{¶ 22} Nevertheless, the owners' association maintains that different rates for the two different groups of customers are justified, based on their substantially disparate amounts of contributed capital.

{¶ 23} The owners' association's argument, however, fails in several respects: (1) the owners' association has not met its burden of proof regarding the disparity

of contribution of capital by the two CTTS customer groups, (2) the owners' association concedes that the differing residential rates charged by large electric utilities used in its examples are based on differing costs of providing services, implying that those differing costs are based on differing levels of capital contributions with respect to those services, and (3) even if the averment of disparate capital contribution by the two groups of CTTS's customers is considered to have been proven, the owners' association has offered no evidence that the disparity has caused a quantifiable difference in the costs to CTTS of providing its service to the two customer groups.

{¶ 24} This court has recognized limitations upon its function and review of appeals of commission orders that establish rates and rate-related classifications:

{¶ 25} "The function and jurisdiction of this court in an appeal from an order of the commission is limited. * * * Our function is not to weigh the evidence or to choose between alternative, fairly debatable rate structures. That would be to interfere with the jurisdiction and competence of the commission and to assume powers which this court is not suited to exercise." *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1976), 46 Ohio St.2d 105, 108, 75 O.O.2d 172, 346 N.E.2d 778.[5]

{¶ 26} We find no error in the commission's approval of a uniform rate to be charged for sewerage service provided by CTTS to its customers.

### Refund or Further Reduction of the Rate Base for Overpayment Based on an Overstated Rate Base

{¶ 27} The owners' association contends that CTTS's ratepayers are entitled to a refund of the difference between the rates paid using the commission-approved rate base with no deduction for CIAC and rates determined with the appropriate CIAC deduction. Neither the commission nor this court can order a refund of previously approved rates, however, based on the doctrine set forth in *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 2 O.O.2d 85, 141 N.E.2d 465. As stated in the second paragraph of the *Keco* syllabus, "Where the charges collected by a public utility are based upon rates which have been established by an order of the Public Utilities Commission of Ohio, the fact that such order is subsequently found to be unreasonable or unlawful on appeal to the Supreme Court of Ohio, in the absence of a statute providing therefor, affords no right of action for restitution of the increase in charges collected during the pendency of the appeal."

---

5. See, also, *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288, citing *Dayton v. Pub. Util. Comm.* (1962), 174 Ohio St. 160, 162, 21 O.O.2d 427, 187 N.E.2d 150.

{¶ 28} The owners' association acknowledges that the *Keco* decision "has been followed consistently in a long line of cases. *See*, for example, *Lucas Cty. Commrs. v. Pub. Util. Comm.* (1997), 80 Ohio St.3d 344, 686 N.E.2d 501." The owners' association, however, urges the court to recognize an exception to *Keco* when a utility has deliberately withheld documents in its rate case or otherwise deceived the commission. We agree with the commission that the owners' association did not prove the premise of its argument. We decline to consider an exception to *Keco* on the basis of this record.

{¶ 29} As an alternative to providing for an overpayment refund, the owners' association—citing R.C. 4909.05—asks that CTTS be required to treat the "overpayment" as additional CIAC in further reduction of its rate base. While in its order the commission characterized the alleged overpayment as a double recovery, it declined to rule on the proposed alternative treatment as an additional CIAC deduction from rate base: "We make no decision with regard to the issue at this time, but leave it to a future Commission to decide." Thus, consideration of the issue of whether the "double recovery" by CTTS should be treated as additional CIAC was deferred by the commission. R.C. 4909.05(J) has no application absent a determination that the "double recovery" constituted additional CIAC. Therefore, the commission did not err by failing to make a further CIAC deduction from the rate base of CTTS under R.C. 4909.05(J).

## Conclusions

{¶ 30} The commission's use of 747 as the denominator in the formula for calculating contributed capital, rather than 570, was against the manifest weight of the evidence and was so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty, resulting in error that caused the commission to understate CTTS's contributed capital and overstate the rate base. The commission in the complaint case order committed no other errors. Therefore, we reverse and remand to the commission with instructions to redetermine CTTS's contributed capital and rate base, and we affirm the commission in all other respects.

Order reversed in part,
affirmed in part,
and cause remanded.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

---

Fuller & Henry Ltd., Fred J. Lange Jr., Dennis A. Lyle and Mark A. Shaw, for appellant.

Jim Petro, Attorney General, Duane W. Luckey, William L. Wright and Matthew J. Satterwhite, Assistant Attorneys General, for appellee.

Bricker & Eckler, L.L.P., Sally W. Bloomfield and Thomas J. O'Brien, urging affirmance for amicus curiae, Carroll Township Treatment Services, L.L.C.

