OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


Columbus Southern Power Company, Appellant, v. Public Utilities
Commission of Ohio et al., Appellees.
[Cite as Columbus Southern Power Co. v. Pub. Util. Comm.
(1993),      Ohio St.3d     .]
Public Utilities Commission -- Conversion of nuclear power
     plant to coal-fired facility -- Application for rate
     increase -- Review of commission order by Supreme Court
     governed by R.C. 4903.13.
     (No. 92-1773 -- Submitted June 2, 1993 -- Decided
November 4, 1993.)
     Appeal from the Public Utilities Commission of Ohio, No.
91-418-EL-AIR.
     In 1969, appellant, Columbus Southern Power Company
("CSP") (formerly Columbus & Southern Ohio Electric Company),
Cincinnati Gas & Electric Company, and Dayton Power & Light
Company entered into a joint venture to construct the William
H. Zimmer Nuclear Power Station ("Zimmer").  Zimmer was to
begin operating in 1975.  In November 1982, after numerous
construction delays, the Nuclear Regulatory Commission
suspended all safety-related construction at the site.  By
agreement dated January 20, 1984, the joint venturers canceled
the Zimmer project as a nuclear plant and agreed to use their
best efforts to convert Zimmer to a coal-fired facility.
     On October 23, 1984, appellee, Public Utilities Commission
of Ohio ("PUCO"), initiated In the Matter of the Restatement of
the Accounts and Records of The Cincinnati Gas & Electric
Company, The Dayton Power & Light Company, and Columbus &
Southern Ohio Electric Company, PUCO No. 84-1187-EL-UNC, to
determine the portion of the capital invested in the Zimmer
project "which may not be used and useful in a converted
coal-fired" plant.  On October 1, 1985, the parties to that
proceeding, with the exception of the city of Cincinnati and
the Board of Commissioners of Hamilton County, entered into a
stipulation resolving that issue.  The stipulation prohibited
the owner utilities from including a total of $861 million in
existing Zimmer investment in future rate applications.  The
city of Cincinnati filed objections to the agreement.  After
conducting hearings on the city's objections, the PUCO approved

the stipulation by order of November 26, 1985. No appeal was taken from that order.

Zimmer was converted to a coal-fired generating unit and was placed in service beginning March 30, 1991. On April 2, 1991, the owner utilities each filed an application to increase electric rates in their respective service territories. The utilities' primary purpose was to receive a return on their Zimmer investment, which totaled $3.069 billion, exclusive of the $861 million disallowed by the stipulation. CSP's jurisdictional share was $845,653,000.

In its application, CSP sought a gross annual revenue increase of $202,137,000. After making adjustments related to the Zimmer rate-base valuation, the rate of return, and rate-case expenses, the PUCO, on May 12, 1992, approved a revenue increase of $123,022,000, with the portion attributable to the Zimmer investment phased in over a period of three years.

On July 2, 1992, the PUCO denied CSP's application for rehearing on the issues raised in this appeal. The cause is

now before this court upon an appeal as of right.

Marvin I. Resnik, Kevin F. Duffy, James R. Bacha, James L. Reeves and F. Mitchell Dutton, for appellant.

Lee I. Fisher, Attorney General, James B. Gainer, Duane W. Luckey, Thomas W. McNamee, William L. Wright, Jeffrey D. Van Niel and Paul A. Colbert, Assistant Attorneys General, for appellee.

Vicki Miller, Acting Consumers' Counsel, Michael McCord, Thomas W. Atzberger, Evelyn R. Robinson-McGriff, Richard W. Pace, Sr., and Barry Cohen, Associate Consumers' Counsel for intervening appellee Office of Consumers' Counsel.

Emens, Kegler, Brown, Hill & Ritter, Samuel C. Randazzo and Richard P. Rosenberry, for intervening appellee Industrial Energy Consumers.

Chester, Hoffman, Willcox & Saxbe and John W. Bentine, for intervening appellee Ohio Council of Retail Merchants.

Per Curiam. R.C. 4903.13 governs our review of PUCO orders. It provides in pertinent part:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable. ***"

In MCI Telecommunications Corp. v. Pub. Util. Comm. (1988), 38 Ohio St.3d 266, 268-269, 527 N.E.2d 777, 780, we interpreted this standard of review:

"Under the 'unlawful or unreasonable' standard specified in R.C. 4903.13, this court will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show that the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. Dayton Power & Light Co. v. Pub. Util. Comm. (1983), 4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733; Columbus v. Pub. Util. Comm. (1979), 58 Ohio St.2d 103, 12 O.O.3d 112, 388 N.E.2d 1237. This court does, however, have complete and independent

power of review as to questions of law. Legal issues are, therefore, subjected to a more intensive examination than are factual questions. Consumers' Counsel v. Pub. Util. Comm. (1983), 4 Ohio St.3d 111, 4 OBR 358, 447 N.E.2d 749."

We consider and resolve the six errors alleged by CSP with these standards in mind.

## I.   THE PHASE-IN PLAN

It is axiomatic that the PUCO, as a creature of statute, may exercise only that jurisdiction conferred upon it by the General Assembly. Dayton Communications Corp. v. Pub. Util. Comm. (1980), 64 Ohio St.2d 302, 18 O.O.3d 478, 414 N.E.2d 1051; Pike Natural Gas Co.v. Pub. Util. Comm. (1981), 68 Ohio St.2d 181, 22 O.O.3d 410, 429 N.E.2d 444; Consumers' Counsel v. Pub. Util. Comm. (1981), 67 Ohio St.2d 153, 21 O.O.3d 96, 423 N.E.2d 820; Werlin Corp. v. Pub. Util. Comm. (1978), 53 Ohio St.2d 76, 7 O.O.3d 152, 372 N.E.2d 592; Ohio Pub. Interest Action Group, Inc. v. Pub. Util. Comm. (1975), 43 Ohio St.2d 175, 72 O.O.2d 98, 331 N.E.2d 730.

While the General Assembly has delegated authority to the PUCO to set just and reasonable rates for public utilities under its jurisdiction, it has done so by providing a detailed, comprehensive and, as construed by this court, mandatory ratemaking formula under R.C. 4909.15. See Gen. Motors Corp. v. Pub. Util. Comm. (1976), 47 Ohio St.2d 58, 1 O.O.3d 35, 351 N.E.2d 183.

R.C. 4909.15(A) requires the PUCO to make a series of determinations -- the valuation of the utility's property in service as of date certain (R.C. 4909.15[A][1]), a fair and reasonable rate of return on that investment (R.C. 4909.15[A][2]), and the expenses incurred in providing service during the test year (R.C. 4909.15[A][4]). Once those determinations are made, the PUCO is required to "compute the gross annual revenues to which the utility is entitled" (emphasis added) under division (B) by adding the dollar return on the company's investment (R.C. 4909.15[A][3]) to the utility's test year expenses. If the charges under the utility's existing tariff are insufficient to generate those revenues, the PUCO is required to fix new rates that will raise the necessary revenue. R.C. 4909.15(D) provides in part:

"When the public utilities commission is of the opinion, after hearing and after making the determinations under divisions (A) and (B) of this section, that any rate *** is, or will be, unjust, unreasonable *** or that the maximum rates *** chargeable by any such public utility are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall:

"***

"(2) With due regard to all such other matters as are proper, according to the facts of each case,

"***

"(b) *** fix and determine the just and reasonable rate *** that will provide the public utility the allowable gross annual revenues under division (B) of this section, and order such just and reasonable rate *** to be substituted for the existing one." (Emphasis added.)

In this case, the PUCO made the determinations required by division (A) and computed the gross annual revenues in

accordance with division (B).  It then found that such revenues exceeded the revenues generated under CSP's present rate schedule (by $123,022,000) and, noting the magnitude of the increase, ordered a three year phase-in of the gross annual revenue increase associated with the converted Zimmer facility ($117,517,000).  Further, the PUCO authorized recovery of the deferrals created in years one and two of the phase-in over a ten-year period, with carrying charges.

CSP initially argues that the PUCO ordered phase-in of its revenue increase violates the statutory formula by denying it the gross annual revenues to which it has otherwise been found entitled under R.C. 4909.15(B).  The PUCO argues that the "all such other matters as are proper" language of R.C. 4909.15(D)(2) provides the PUCO with broad discretion to consider a variety of matters in setting rates, including, as here, the reasonableness of the magnitude of a one-time increase.

In the leading case of Consumers' Counsel v. Pub. Util. Comm. (1981), 67 Ohio St.2d 153, 166, 21 O.O.3d 96, 104, 423 N.E.2d 820, 828, we construed "all such other matters as are proper" more narrowly:  "It is our view that R.C. 4909.15(D)(2)(b) is designed to allow the commission [PUCO] to make minor adjustments to rates ascertained by the statutory formula when the criteria upon which the rates are based are skewed for one reason or another.  Thus, under R.C. 4909.15(D)(2)(b), the commission may smooth out anomalies in the ratemaking equation that tend to make the test year data unrepresentative for ratemaking purposes."

We have applied this exception to the mandatory ratemaking formula sparingly, stating in Dayton Power & Light Co. v. Pub. Util. Comm. (1983), 4 Ohio St.3d 91, 95, 4 OBR 341, 344, 447 N.E.2d 733, 736, that such "ad hoc tinkering with the statutory formula is [to remain the exception and] not to become the rule."  See, also, Consumers' Counsel v. Pub. Util. Comm. (1981), 67 Ohio St.2d 372, 21 O.O.3d 234, 424 N.E.2d 300; Ohio Water Service Co. v. Pub. Util. Comm. (1983), 3 Ohio St.3d 1, 3 OBR 300, 444 N.E.2d 1025 (refusal to find an anomaly); Columbus v. Pub. Util. Comm. (1984), 10 Ohio St.3d 23, 10 OBR 175, 460 N.E.2d 1117 (the matter precipitating the adjustment had no basis in the underlying ratemaking statutes).  Moreover, we have applied the exception only to permit recovery of out-of-test-year expenses in appropriate circumstances, see Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm. (1982), 1 Ohio St.3d 125, 1 OBR 163, 438 N.E.2d 111, and Consumers' Counsel v. Pub. Util. Comm. (1983), 6 Ohio St.3d 412, 6 OBR 459, 453 N.E.2d 590), and have not applied it to adjust the date certain valuation of rate base items, see Consumers' Counsel v. Pub. Util. Comm. (1979), 58 Ohio St.2d 449, 12 O.O.3d 378, 391 N.E.2d 311, Consumers' Counsel v. Pub. Util. Comm. (1981), 67 Ohio St.2d 372, 21 O.O.3d 234, 424 N.E.2d 300, and Ohio Edison Co. v. Pub. Util. Comm. (1992), 63 Ohio St.3d 555, 589 N.E.2d 1292.

It cannot be seriously argued that the phase-in of CSP's rates, precipitated by the inclusion of the Zimmer facility in rate base, falls within the revenue adjustments contemplated by our 1981 Consumers' Counsel decision at 67 Ohio St.2d 153, 21 O.O.3d 96, 423 N.E.2d 820.  Clearly, the PUCO did not order the

"adjustment" (or phase-in) because the Zimmer valuation under R.C. 4909.15(A)(1) was unrepresentative. Rather, it believed the result of the computation required under R.C. 4909.15(B) to be unreasonable on its face. Thus, the lawfulness of the PUCO's phase-in plan hinges on whether the PUCO has the authority to reduce, or phase-in, the gross annual revenues computed under R.C. 4909.15(B) in the absence of anomalies in the underlying ratemaking criteria.

The PUCO and intervening appellees, Industrial Energy Consumers et al., argue that such authority is provided by our decision in Industrial Energy Consumers v. Pub. Util. Comm. (1991), 62 Ohio St.3d 440, 584 N.E.2d 653. We disagree. In that case, Columbia Gas of Ohio, Inc. filed an application to increase the rates of its general service class. Pursuant to a separate investigation initiated under R.C. 4905.26, the PUCO determined that the rates of another customer class, special contract customers (R.C. 4905.31), were generating an earned rate of return for the company of 44.85 percent. The PUCO combined its investigation of special contract rates with Columbia's rate cases (bringing all of the company's revenues before it) and, in setting rates under R.C. 4909.15(D), credited the "excess special contract revenues" to the general service revenue requirement, yielding a rate of return found appropriate for the company as a whole. The PUCO's use of the excess special contract revenues to satisfy a portion of the general service revenue requirement did not reduce, or cause to be phased in, the annual revenues to which the company was found entitled under R.C. 4909.15(B) and was required to be provided under R.C. 4909.15(D)(2)(b). Rather, its order affected only the source from which those revenues would be derived and our decision to affirm was consistent with the wide discretion we have afforded the PUCO on other rate design issues. See Gen. Motors Corp. v. Pub. Util. Comm., supra (47 Ohio St.2d 58, 1 O.O.3d 35, 351 N.E.2d 183).

The PUCO also argues that it has the authority to order the phase-in of the company's annual revenue increase under R.C. 4901.02(A), which provides that "[t]he commission shall possess the powers and duties specified in, as well as all powers necessary and proper to carry out the purposes of Chapters *** 4905., [and] *** 4909. *** of the Revised Code." The PUCO contends that the purpose of R.C. Chapters 4905 and 4909 is to set just and reasonable rates and that, having determined the size of the rate increase under the statutory ratemaking formula to be unreasonable, R.C. 4901.02(A) permits it to implement rates which will be reasonable.

The comprehensive ratemaking formula provided by the General Assembly is meant to protect and balance the interests of the public utilities and their ratepayers alike. Dayton Power & Light Co. v. Pub. Util. Comm., supra (4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733). We cannot conclude that it was the General Assembly's intent under the above enabling statute, R.C. 4901.02(A), to permit the PUCO to disregard that very formula in instances in which it simply did not agree with the result. Cf. Consumers' Counsel, supra, 67 Ohio St.3d at 165, 21 O.O.3d at 104, 423 N.E.2d at 828 ("the General Assembly undoubtedly did not intend to build into its recently revised [1976] ratemaking formula a means by which the PUCO may

effortlessly abrogate that very formula").  Moreover, considering the detail with which the General Assembly has legislated in this area, we find that if it had intended to grant the PUCO authority to phase-in a utility's annual revenue increase, it would have specifically provided such a mechanism.  If the PUCO now seeks such authority, its recourse is through the legislature, and not this court.  See Pike Natural Gas Co., supra (68 Ohio St.2d 181, 22 O.O.3d 410, 429 N.E.2d 244).

We find that pursuant to R.C. 4909.15(B), the PUCO is required to "compute the gross annual revenues to which the utility is entitled" under the statutory formula, with limited exceptions not applicable here, and fix rates under R.C. 4909.15(D)(2)(b) that will "provide" the utility with those annual revenues.  The phase-in plan ordered by the PUCO deprives CSP of the annual revenues to which it is entitled during the first two years it is in effect,[1] and exceeds the PUCO's statutory authority.  Accordingly, we reverse the PUCO's determination on this issue.[2]

We must also consider CSP's request that this court instruct the PUCO on remand to provide a mechanism to recover the gross annual revenues already deferred.  Intervening appellees Industrial Energy Consumers et al. argue that such recovery is prohibited under Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co. (1957), 166 Ohio St. 254, 2 O.O.2d 85, 141 N.E.2d 465.

In Keco, a consumer brought an action for restitution after this court's reversal of a PUCO order resulted in lower rates being set on remand.  We held that such action would not lie because a "utility must collect the rates set by the commission."  Id., 166 Ohio St. at 257, 2 O.O.2d at 86-87, 141 N.E.2d at 468.  See R.C. 4905.32.  Here, Industrial Electric Consumers et al. seek to extend that holding to situations where reversal results in higher rates being set, in order to prevent utilities from recovering revenues not collected during the pendency of an appeal.  This argument ignores that the PUCO's initial order in this proceeding specifically authorized recovery of the deferred revenues in question and, thus, those revenues constitute a portion of the rates to which CSP is entitled.  Keco is clearly not controlling.  Further, CSP's recovery of the deferred revenues, having been authorized by the PUCO's initial order, would not violate the proscription against retroactive ratemaking.  See Ohio Edison Co. v. Pub. Util. Comm. (1978), 56 Ohio St.2d 419, 424-425, 10 O.O.3d 523, 526-527, 384 N.E.2d 283, 286.

Accordingly, we instruct the PUCO to fix rates that provide CSP the gross annual revenues determined in accordance with R.C. 4909.15(B) and (D)(2)(b), consistent with this decision.  The PUCO also must provide a mechanism by which CSP is able to recover those revenues deferred to the time the order on remand is issued.

## II.  THE SETTLEMENT

CSP next argues that the rate-base disallowances by the PUCO related to nuclear fuel, nuclear wind-down costs, and allowance for funds used during construction violated the terms of the 1985 stipulation which it had approved.  The stipulation provided in pertinent part:

"15. The [commission's] Staff and the parties to this proceeding did engage in extensive settlement discussions with the Owners and, as a consequence, the following agreements have been reached by the Owners and the other parties hereto [except, as relevant to this case, the city of Cincinnati], which they recommend that the PUCO adopt as the final resolution of the above captioned proceeding.

"A. The sum of $861,000,000.00 and any Allowance for Funds Used During Construction accrued on such sum since January 31, 1984, (the 'Disallowed Amount') shall be disallowed [i.e., not included in future rate requests].

"***

"F. In the event that the Owners determine to go forward with the construction of the converted 1300 MW coal-fired Zimmer facility and the same is completed and brought into service, there is agreement that the sunk costs remaining as of January 31, 1984 after the total Disallowed Amount (including AFUDC properly accrued thereon subsequent to January 31, 1984) will not be challenged by any of the parties hereto as being: (1) the result of mismanagement and/or (2) not being used and useful in the converted Zimmer facility.

"G. In addition, it is understood and agreed that all of the non-Owner parties hereto, while expressing no position with respect to the prudence of the Owners' decisions to use their best efforts to convert Zimmer to a 1300 MW coal-fired plant, reserve the right to challenge the reasonableness of any decision made subsequent to the decision to cancel Zimmer as a nuclear facility in any future proceedings before the commission."

A. Allowance For Funds Used During Construction ("AFUDC")[3]

In its application to increase electric rates, CSP sought recovery of AFUDC on the remaining Zimmer sunk costs (costs remaining after the disallowance) from February 1, 1984, to the plant's completion in March 1991. Several intervenors, who were signatories to the 1985 stipulation, argued that under paragraph 15(F) of the stipulation, AFUDC was not "properly accrued" from February 1984 through February 1987 because construction of the converted Zimmer facility was "interrupted" during that period, pending receipt of a construction permit from the U.S. Army Corps of Engineers (issued March 17, 1987). The PUCO agreed in part with the intervenors and deducted from CSP's proposed rate base valuation the AFUDC accrued from February 1984 until March 1986, the point at which the PUCO decided sufficient construction activity had commenced. In reaching this decision the PUCO relied on FERC (Federal Energy Regulatory Commission) Accounting Release AR-5 (Revised), effective January 1, 1968, which provides in part:

"Interest during construction may be capitalized starting from the date that construction costs are continuously incurred on a planned progressive basis. *** No interest should be accrued during period [sic] of interrupted construction unless the company can justify the interruption as being reasonable under the circumstances." (Emphasis added.)

CSP argues that the AFUDC accrued from February 1984 to the plant's completion is not subject to challenge in this proceeding. It reasons that the intent of the parties in entering the 1985 stipulation was to resolve all issues related

to the nuclear Zimmer facility; that paragraph 15(F) specifically permits AFUDC on the sunk costs remaining as of January 31, 1984; and that the PUCO recognized as much in its order of November 26, 1985 approving the stipulation when it stated that the "settlement represents an opportunity to put nuclear Zimmer behind us" and "closes the chapter on nuclear Zimmer." (Case No. 84-1187-EL-UNC.) As such, CSP argues that the "properly accrued" language in the 1985 stipulation should be construed as permitting challenges only to the mathematical accuracy of the accrual calculations.

We find no basis to construe the stipulation so narrowly. While it is true that the stipulation and order approving it intended to put to rest nuclear valuation issues, they did so as of a specific point in time, January 31, 1984. While the stipulation clearly permits recovery of AFUDC on the sunk costs remaining as of that date, it just as clearly conditions such recovery upon their subsequent proper accrual. We construe that language to mean that the PUCO must review the accruals pursuant to applicable accounting conventions, and not simply for mathematical accuracy. To hold otherwise would be contrary to the general intent of the stipulation that costs incurred after January 31, 1984 are subject to challenge in succeeding PUCO proceedings.

We now turn to the question of whether the AFUDC accruals between February 1984 and March 1986 were proper under FERC AR-5. There is little doubt that construction of the Zimmer facility was interrupted when the Nuclear Regulatory Commission ("NRC") halted safety-related construction in November 1982. As much is confirmed by an internal American Electric Power Service Corporation memorandum, dated December 19, 1983, which states that "[a]t Zimmer, the NRC ordered virtually all construction stopped pending a determination as to the work necessary to complete the plant properly."

Finding first that CSP did not carry its burden of showing the 1982 interruption to be reasonable,4 the PUCO then determined that construction did not commence on the converted Zimmer facility on a "planned progressive basis" until major construction contracts were awarded in February 1986. CSP argues that construction was occurring on a planned progressive basis at the facility during the period from February 1984 through February 1987, and points to its witness's testimony that construction activities during that timeframe consisted of project planning and scheduling, engineering, design and procurement, site investigation, licensing and permitting, site construction activities, and existing facility modifications and maintenance.

In its order, the PUCO discounted these activities, finding that many were not construction specific or had occurred after February 1986. Further, the PUCO noted that the owner utilities announced on January 20, 1984 their decision to abandon Zimmer as a nuclear facility, and that they made only a qualified decision to convert the facility to a coal-fired plant on August 1, 1984, contingent upon satisfying financial, regulatory, and environmental concerns. Moreover, the record reflects that at the time the 1985 stipulation was approved, the owners had not yet decided to go forward with the construction of the converted Zimmer facility.

The point at which construction of the converted facility began on a planned and progressive basis is a question of fact. The PUCO's determination that construction had not commenced sufficiently to warrant the accrual of AFUDC until March 1986, was not "manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." MCI Telecommunications, supra (38 Ohio St.3d 266, 527 N.E.2d 777). Accordingly, we affirm the PUCO on this issue.

B. Nuclear Fuel Expense and Nuclear Wind-down Costs

The PUCO also reduced CSP's proposed rate-base valuation by amounts related to nuclear fuel expense and "nuclear wind-down costs" (costs incurred after January 31, 1984 for obligations related to the construction of Zimmer as a nuclear facility). As above, CSP argues that the intent of the 1985 stipulation was to resolve all nuclear-related issues and contends that these disallowances were written off as a part of the $861 million disallowance provided for in paragraph 15(A) of the stipulation. We disagree.

We have already found that the stipulation was crafted with regard to the specific date of January 31, 1984. The record shows that neither the nuclear fuel nor the nuclear wind-down costs were included in the Zimmer investment considered as of that date by the parties. Accordingly, we agree with the PUCO and ascribe no intent to the parties that these amounts were to be disallowed under paragraph 15(A) or included in the sunk cost not subject to challenge in paragraph 15(F). Because these items cannot be regarded as used and useful in a converted Zimmer facility, the PUCO properly excluded them from rate base in this case.

III. CONFISCATION

CSP also argues that the PUCO's order resulted in a confiscation of its property in violation of the Fifth and Fourteenth Amendments to the United States Constitution. It bases its claim upon the revenues it will be deprived of as a result of the phase-in plan and its inability to earn a return on the rate-base items (AFUDC, nuclear fuel, and nuclear wind-down costs) disallowed by the PUCO. Our reversal of the PUCO's phase-in plan renders CSP's claim of confiscation on that basis moot. Further, because the rate-base items were properly excluded under the statutory ratemaking formula and, therefore, CSP is not entitled to any return on these items, the PUCO's ruling was not confiscatory. See Dayton Power & Light Co. v. Pub. Util. Comm. (1983), 4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733.

IV. ELECTRIC POWER RESEARCH INSTITUTE DUES

In its application, CSP sought recovery of $2,727,583 in estimated membership dues associated with its proposal to join the Electric Power Research Institute ("EPRI") in the future. To support its request, CSP presented a witness who generally extolled the benefits of membership, acknowledging that it would enhance CSP's research and development efforts to the benefit of the utility and its consumers alike. The witness further testified that CSP had been considering joining EPRI for a number of years, but could not explain why it had not done so in 1990, just prior to the test year, recognizing that

PUCO precedent permitted recovery of the membership dues.

The PUCO denied CSP's request as an improper out-of-test-year expense. See Columbus v. Pub. Util. Comm. (1984), 10 Ohio St.3d 23, 25, 10 OBR 175, 177, 460 N.E.2d 1117, 1120 (There is a "strong presumption that only expenses incurred during the test year may be included in awarding a rate increase."). The PUCO further found, considering CSP's evidence regarding the benefits of membership, that the failure to join EPRI constituted an unreasonable practice and, as a result, made an unquantified downward adjustment to CSP's return on equity. The PUCO stated that it "strongly encourages" and "expects" CSP to join EPRI. It also ordered CSP "to demonstrate in its next long-term forecast filing that it has joined EPRI. If the company does not do so, then the Commission will use its authority pursuant to Section 4909.154, Revised Code, to remedy the company's unreasonable practice."

CSP does not contest the PUCO's disallowance of this proposed post-test-year expense. Instead, it characterizes the PUCO's above statements as an "order" that it join EPRI and argues that such an order unlawfully interferes with CSP's managerial discretion. See Elyria Tel. Co. v. Pub. Util. Comm. (1953), 158 Ohio St. 441, 448, 49 O.O. 391, 394, 110 N.E.2d 59, 63 ("The Public Utilities Commission is a creature of statute. *** Its powers do not include the right to manage utilities or dictate their policies."). See, also, R.C. 4909.154 (commission may only recommend management policies on management practices to the public utility).

We agree that the PUCO is without power to order CSP to join EPRI. Id. However, we refuse to characterize the language used by the PUCO in this instance as an "order". Rather, it is more properly construed as a warning that if CSP does not join EPRI, it will be subject to possible disallowances in future rate proceedings. The decision whether to join EPRI or suffer the possible consequences rests squarely with CSP. Having so found, we need not address CSP's alternative argument that, if the "order" is deemed lawful, the PUCO must allow CSP's recovery of the estimated membership dues.

CSP also argues that R.C. 4909.154 provides the only means by which the PUCO may make adjustments for imprudent management decisions and that the downward adjustment to its return on equity constitutes an unlawful circumvention of the ratemaking statutes. We disagree.

It is fundamental that a utility's management practices be considered when setting its authorized rate of return. See, e.g, Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm. of W.Va. (1923), 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1183 ("The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."). As such, the PUCO's broad authority to fix a fair and reasonable rate of return under R.C. 4909.15(A)(2) provides an independent source of authority for the PUCO to consider a utility's management practices. Cf. Babbit v. Pub. Util. Comm. (1979), 59 Ohio St.2d 81, 13 O.O.3d 67, 391 N.E.2d 1376.

Customarily, as here, the PUCO employs the discounted cash flow methodology in calculating a utility's cost of common equity. Recognizing the inherent imprecision in fixing a return on equity, a range is developed (here, 11.63 to 12.74 percent) and any point therein is considered reasonable -- a principle which CSP does not contest. It is when considering what point within the range should be adopted that the PUCO considers the company's management practices, as well as other matters. See Cincinnati Bell Tel. Co. v. Pub. Util. Comm. (1984), 12 Ohio St.3d 280, 12 OBR 356, 466 N.E.2d 848. In this case, the PUCO considered several of CSP's management practices that supported selection of a return above the midpoint of the range, and several factors (specifically, CSP's failure to join EPRI and lack of commitment to demand side management) that supported the adoption of a return below the midpoint. Considering all of these factors, and without quantifying the effects of any, the PUCO selected a return on equity at the third quartile of the range (12.46 percent). Because we do not find unlawful the PUCO's determination that CSP's failure to join EPRI constituted an unreasonable management practice, we likewise cannot find the PUCO's cost of equity adjustment to be unreasonable.

## V. RATE CASE EXPENSE

Finally, CSP contends that the PUCO erred by disallowing the legal fees CSP incurred in defending its right to place its proposed rates in effect under R.C. 4909.42. We agree.

R.C. 4909.42 provides that if the PUCO does not issue an order in a utility's rate case within two hundred seventy-five days of its filing of the application to increase rates, the utility may, as an interim measure, place in effect the rates proposed in its application without the PUCO's approval. In this proceeding, the two-hundred seventy-five day limit expired before the PUCO had begun hearings on CSP's rate application and CSP notified the PUCO on December 9, 1991 of its intent to place its proposed rates in effect. In an accounting order, the PUCO, sua sponte, attempted to avert CSP's action by authorizing it to defer certain current expenses for recovery in its next rate case, finding that such deferrals were all that was "necessary" to compensate shareholders until the PUCO issued its order in this proceeding. Nevertheless, CSP elected to pursue its rights under R.C. 4909.42. Various intervenors subsequently filed suit in the Franklin County Court of Common Pleas seeking a declaratory judgment that R.C. 4909.42 is unconstitutional and a permanent injunction preventing CSP from charging the interim rates. See State ex rel. Columbus So. Power Co. v. Sheward (1992), 63 Ohio St.3d 78, 585 N.E.2d 380; O'Brien v. Columbus So. Power Co. (1992), 73 Ohio App.3d 355, 597 N.E.2d 188.

The PUCO authorized, as "ordinary and necessary" operating expenses, CSP's recovery of legal fees associated with the prosecution of this case before the PUCO and recovery of the legal fees associated with an unsuccessful alternative dispute resolution process conducted by an independent private entity prior to hearing. However, the PUCO denied recovery of the legal fees CSP incurred in defending its right to place its proposed rates in effect under R.C. 4909.42, reasoning that it had already found such action "unnecessary" in its previous

accounting order.

We find the PUCO's focus on whether it was necessary for CSP to place its proposed rates in effect to be misplaced. The General Assembly has granted utilities the unequivocal right to do so under R.C. 4909.42 without the PUCO's consent or interference. See Sheward, supra, at 80, 585 N.E.2d at 382, fn. 3. The appropriate inquiry is whether legal fees are ordinary and necessary expenses in obtaining rate relief as provided by law. On this basis, we have upheld the PUCO's inclusion of this expense on many occasions and have generally deferred to its discretion in quantifying the level of the expense when unclear on the record. See, e.g.,Cincinnati v. Pub. Util. Comm. (1950), 153 Ohio St. 56, 41 O.O. 129, 90 N.E.2d 681; Cleveland v. Pub. Util. Comm. (1980), 63 Ohio St.2d 62, 17 O.O. 3d 37, 406 N.E.2d 1370; Canton v. Pub. Util. Comm. (1980), 63 Ohio St.2d 76, 17 O.O.3d 46, 407 N.E.2d 9. Here, however, there is no dispute as to whether the amount of the legal fees was reasonable. Having allowed recovery of legal expenses incurred to obtain rate relief in proceedings before the PUCO and to obtain rate relief through the alternative dispute resolution process (even though unsuccessful), we find it unreasonable to deny recovery of the expenses incurred to obtain timely rate relief through R.C. 4909.42. Accordingly, the PUCO's determination on this issue is reversed.

> Order affirmed in part, reversed in part, and cause remanded to the PUCO for further action in accordance with this opinion.

Moyer, C.J., A.W. Sweeney and Wright, JJ., concur.
Douglas, J., concurs separately.
Resnick, F.E. Sweeney and Pfeifer, JJ., dissent.

FOOTNOTES

1 So finding, we reject the PUCO's argument that CSP has not been prejudiced by the phase-in plan because of its ability to defer on its books and ultimately collect the revenues foregone in the first two years of the plan, with carrying charges. Cf. Alabama Power Co. v. Alabama Pub. Serv. Comm. (Ala. 1980), 390 So. 2d 1017, 1027 ("There is no authority found in the statutes that permits the Commission to phase in a rate increase. *** If the Commission determines a utility has a rate deficiency, it has a duty to remedy that deficiency. The fact that the Commission's order will eventually remedy an existing deficiency does not validate the order." [Emphasis sic.])

2 Having found that the PUCO is without authority to order the phase-in of a utility's annual revenues, we need not address CSP's alternative proposition of law that this particular phase-in plan is unlawful in that it authorizes a post-date-certain reduction to the established Zimmer valuation.

3 AFUDC is an accounting mechanism by which utilities recognize the capital costs associated with financing construction. These costs include interest on borrowed funds as well as the cost of equity capital, and are booked as part of the value of the asset during construction, and are

subsequently recognized in rates when the asset is included in rate base. See Consumers' Counsel v. Pub. Util. Comm. (1983), 6 Ohio St.3d 377, 6 OBR 428, 453 N.E.2d 673.

4  On appeal, CSP does not contest the PUCO's finding that it has failed in its burden. However, Cincinnati Gas & Electric Co., in its companion appeal decided this date, Cincinnati Gas & Electric Co. v. Pub. Util. Comm. (1993), Ohio St.3d    ,     N.E.2d    , argues that the interruption was reasonable because it was ordered by the NRC. The PUCO did not accept this justification in either CSP's or CG&E's cases below. Certainly, the NRC order precipitated the interruption and it was reasonable for the companies to obey that order; but that does not, in and of itself, justify an interruption of meaningful construction for a period of over three years. Indeed, there is nothing in the record before us to refute that the continued interruption resulted from nothing more than the companies' indecision on whether to convert the facility. Accordingly, we affirm the PUCO's finding.

Douglas, J., concurring.    I concur. I write separately to express my concerns over the continued unchallenged validity and the majority's reference to the so-called proscription against retroactive ratemaking. The majority says that "* * * CSP's recovery of the deferred revenues, having been authorized by the PUCO's initial order, would not violate the proscription against retroactive ratemaking." This is, of course, flexuous reasoning -- at best.

Retroactive ratemaking is a long-recognized rule of public utility regulation. This rule, court recognized, in general restricts the right or ability of the Public Utilities Commission to permit a public utility to recover past losses through future rates and, also prevents refunds to consumers of profits of a utility which are subsequently found to have been excessive. Thus, when the commission hears and determines a rate case, the commission may only look to the future in determining appropriate utility rates. This is because of the so-called rule against retroactive ratemaking.

Through the procedures used, the ratemaking process is prospective in nature. Utilities file with the commission proposed new rates and the commission enters an order fixing the rates to be charged in future years. Then, more often than not, an appeal (by some principal or intervening party) is taken and if this court reverses the rate order, the case is remanded to the commission to again set the rates and this, again, is prospective in nature. Oftentimes, this process goes on for years (the case at bar commenced in 1984), and, regardless of the eventual outcome, the cost to all parties is enormous.

A number of courts across the country (including this court in today's decision), while paying lipservice to the rule, have found ways to create necessary exceptions to the rule to compensate for utility costs created by (1) utility commissions' changes in accounting methodology; (2) rate orders containing mistakes; (3) losses occasioned by emergency weather conditions (ice storms and other storms like the recent one in Cleveland); (4) revenue loss during periods of rate proceedings, appeals and remands for new orders after court review; and (5) nuclear plant cancellation. Apparent slavish

adherence to the rule, making it an absolute of ratemaking, has been something less than that in practice as courts continue to create exceptions to the rule. These exceptions are necessitated by the demands of modern-day utility regulation operating under very old (and maybe archaic) laws, rules and regulations. A product of all this is regulatory lag and seemingly continuous and endless rate proceedings.

Since there seem to be no specific sections of the Revised Code which prohibit the commission from retroactive ratemaking, the genesis of the rule is obviously judicial rather than legislative. I write now only to suggest that perhaps the time has come for the General Assembly, the commission and/or this court to meet modern-day utility regulation with new and innovative thinking. This is not to say that the ratemaking process should be ever in a state of flux. Reliability is not only desirable -- it is essential in our ratemaking system. However, the rule that utility rates must be permanent and can only be changed prospectively may not provide the flexibility we need to meet the modern needs of both consumers and utilities.

I only suggest herein that maybe the time has come for us not to apply the retroactive ratemaking rule so absolutely. It is fair that both the commission and this court apply the rule with a presumption that it is valid in a given case, but we should review the facts of each case to determine whether the presumption should apply or has, for good reason, been effectively rebutted. Applying the rule only as a presumption would afford the commission and this court the flexibility of allowing retroactive relief for any number of reasons, including the period of time while a case is on appeal and during the remand period after reversal, as here, of a rate order.

"That court best serves the law which recognizes that the rules of law which grew up in a remote generation may in the fullness of experience be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. * * *" Dwy v. Connecticut Co. (1915), 89 Conn. 74, 99, 92 A. 883, 891 (Wheeler, J, concurring).

The results of today's decision will be devastating to many. Unfortunately, that is sometimes the case when the result, as here, is driven and dictated by the law. Must it always be so in public utility rate cases? There must be a better way! However, I submit, we do not seek possible new and better ways when we remain totally satisfied with what has gone on before and by rote say we are not ignoring the rule against retroactive ratemaking -- while doing just that.

While I concur in the judgment of the majority, I do so with the hope that this suggestion, with regard to the rule against retroactive ratemaking, will promote legislative and commission inquiry, scholarly academic writing and discussion, and generally enlightened dialogue. Meanwhile, for us to say

we are not violating the rule against retroactive ratemaking, when in fact we really are, does a disservice, I believe, to consumers, utilities, the Public Utilities Commission, the bench and the bar.

Pfeifer, J., dissenting.    I would read the "all such other matters as are proper" clause in R.C. 4909.15(D)(2) as being broad enough in its scope to authorize the action undertaken by the Public Utilities Commission of Ohio ("PUCO") to implement a three-year staggered rate increase.  The record indicates ample evidence supporting the compelling public policy reasons for the approach taken by the PUCO.  Rate shock can be disastrous not only for the family budget, but also for Ohio's business climate.

The PUCO, however, has no statutory authority to revoke its own prior stipulations when they are retrospectively regretted.  The PUCO's own words in its November 26, 1985 order are unquivocal: "[The] settlement represents an opportunity to put nuclear Zimmer behind us***[and] closes the chapter on nuclear Zimmer." (PUCO case No. 84-1187-EL-UNC, 11-12.)  These words memorialize a promise by the PUCO not to further contest the inclusion in the ratebase of accrued AFUDC, nuclear fuel expenses, and for nuclear wind-down costs.

A deal's a deal.  It is regrettable that a state agency, which entered into this agreement on behalf of the public in an effort to encourage utility companies to build new, safer, more efficient generating facilities, now exhibits bad faith by renouncing its covenant not to contest once the project was completed.